**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2:21-cr-71 |
| | ) | |
| HAILEY GIST-HOLDEN, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Defendant Hailey Gist-Holden, pro se, filed a number of motions in this case where he is charged with armed bank robbery which led to the shooting death of a security guard. [DE 20.] This order will address and rule on the following motions: three motions for a *Franks* hearing [DE 42, 43, 47]; a motion to dismiss and amended motions to dismiss [DE 51, 68, 84]; a motion to dismiss for lack of jurisdiction [DE 67]; and a motion to suppress evidence and amendment to the motion to suppress [DE 41, 69].

Let me first say that Gist-Holden has made an abundance of arguments in the briefs associated with all of these motions. I have done my utmost to address the issues he has raised. To the extent he raises new issues in his reply briefs, specifically DE 106 and 108, these are waived. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) (finding arguments raised for the first time in a reply brief are waived). For all of the reasons articulated below, Gist-Holden's multiple motions fail.

## Discussion

### I.      Requests for a *Franks* Hearing [DE 42, 43, 47]

Gist-Holden has filed three motions, all arguing he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). He attacks the search warrants issued for his residence on Buchanan Street, Gary [DE 42]; search records and location information for the cell phone number ending in -1806 [DE 43]; and to get information from another cell phone number ending in -9762 [DE 47]. First, I'll cover some standards that are applicable to all three motions, and then I'll specifically address each one in turn.

"A search warrant affidavit establishes probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015) (citation omitted). Where the issuance of a search warrant is based entirely on an affidavit, "the validity of the warrant depends solely on the strength of the affidavit." *United States v. Johnson*, 867 F.3d 737, 741 (7th Cir. 2017) (citing *United States v. Carson*, 582 F.3d 827, 831-32 (7th Cir. 2009)). A reviewing court gives "great deference" to the conclusion of the issuing judge that there was probable cause to support the warrant. *United States v. Robinson*, 724 F.3d 878, 884 (7th Cir. 2013).

Under *Franks*, a defendant is entitled to an evidentiary hearing on the truthfulness of information submitted in a search warrant application if he can make a "substantial preliminary showing" that: (1) the warrant application contained a material misstatement or omission that would alter the issuing judge's probable cause

determination; and (2) the affiant included or omitted the information intentionally or with a reckless disregard for the truth. *United States v. Clark*, 935 F.3d 558, 562 (7th Cir. 2019); *Franks*, 438 U.S. at 155. However, if a finding of probable cause is supported even without the false statements, "a hearing is unnecessary and the motion should be denied." *United States v. Mullins,* 803 F.3d 858, 862 (7th Cir. 2015); *see also United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (the false statement must have been "necessary to support the finding of probable cause."). *Franks* hearings are "rarely held" because "[t]hese elements are hard to prove." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000). In this case, Gist-Holden has not come close to meeting his burden.

In evaluating whether Gist-Holden is entitled to a *Franks* hearing, it is important to keep in mind the substantial preliminary showing that he must first make "is not met by mere conclusory statements" or "self-serving statements." *United States v. Taylor*, 154 F.3d 675, 679-80 (7th Cir. 1998). Rather, the defendant's "allegations must be accompanied by an offer of proof" such as affidavits or sworn statements, or some other explanation for why the defendant cannot present as much. *Franks*, 438 U.S. at 171. *Franks* "applies to omissions as well as affirmative misrepresentations." *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016) (citing *Mullins*, 803 F.3d at 862). But when relying on omissions, the defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. McNeese*, 901

F.2d 585, 594 (7th Cir. 1990) (overruled on other grounds).

At the first step, I have to consider whether a statement is "material." A material misstatement affects the probable cause determination. In other words, if I set aside that statement and there remains sufficient facts to support probable cause, the statement is not material. *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003). Probable cause exists when a judge can "make a practical, commonsense decision" that "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Rees*, 957 F.3d 761, 766 (7th Cir. 2020). Probable cause "depends on the totality of the circumstances – the whole picture – not each fact in isolation." *Id.*

At the second step, the defendant must show the misstatement or "omission was designed to mislead or was made in reckless disregard of whether it would mislead." *United States v. McMurtrey*, 704 F.3d 502, 511 n.5 (7th Cir. 2013). The focus should be on the officer who submitted the affidavit, and whether he "perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). "It is not enough to show that [the person quoted in the affidavit] lied to the government officer, who then included those lies in the complaint." *Id.*

## A.    First *Franks* Motion – Search Warrant for Buchanan Street Residence

The first motion asking for a *Franks* hearing deals with the search of Gist-Holden's residence on Buchanan Street in Gary. [DE 42.] Gist-Holden attacks the

affidavit supporting the search of the house.

The affidavit is drafted by FBI Special Agent Andrew Chonowski and dated June 15, 2021. [DE 97-1 at 2.]  Based upon the facts set forth in the affidavit, he concluded there was probable cause to believe the residence contained evidence of contraband, fruits, and instrumentalities used in the commission of a bank robbery on June 11, 2021. [*Id.* at 2-3.] Specifically, on June 11, 2021, the First Midwest Bank located at 1975 Ridge Road, Gary, Indiana, was robbed by two males dressed in black with hoods covering their heads. [*Id.* at 3.]   The robbery was caught on surveillance camera. *Id.*  One suspect carried a long gun, shot and killed the bank's security guard who was outside on the sidewalk in front of the bank, then shot rounds into the bank lobby ceiling.  *Id.*  The other suspect carried a handgun, ran into the bank, ordered an employee to open the door separating the teller area from the customer area, and then took $9,899.09. [*Id.* at 4.]

Both suspects then fled.  The Lake County Sheriff's office located one suspect, James King, during a perimeter search.  *Id.*  A backpack containing approximately $9,000 and a .22 handgun was recovered about 25 yards from where King was apprehended.  *Id.*  King was transported to the Lake County Jail, read his *Miranda* rights, and agreed to an interview with law enforcement. [*Id.* at 4-5.] During the interview, he admitted to participating in the robbery, but stated his accomplice, "Coach Hailey," shot the security guard. [*Id.* at 5.] King said he knew Hailey from the semi-professional football team he played on, the Illini Panthers.  *Id.*  Law enforcement

5

identified "Coach Hailey" as Hailey Gist-Holden, a wide receiver for the Panthers, and according to the roster, 6 foot tall and 195 pounds. *Id.* These measurements were consistent with the appearance of the other suspect on the bank surveillance footage. *Id.* King identified Gist-Holden in a photo line-up as the other accomplice in the robbery, and the person who shot the security guard. *Id.* King admitted to getting into the car with Gist-Holden and driving to Gary, Indiana, to commit the robbery. *Id.*

King also said that during a meeting planning the robbery, he texted a friend (Travis Mogene), saying he didn't want to participate in the robbery, and they were doing it to pay for a hotel where the football team was staying. [*Id.* at 5-6.] During that meeting, King took a photograph, which he texted to Mogene. [*Id.* at 6.] The picture shows a person sitting on the couch wearing a back hooded sweatshirt with the hood up, black shoes, and an olive drab "sling" was slung over the person's shoulder. *Id.* The sling looked similar to the one fixed to the AR-style rifle carried by the other suspect during the bank robbery (which was caught on video). *Id.* After doing some research online and looking at Gist-Holden's girlfriend's social media posts, the authorities determined that the interior of the Buchanan house matched the photo of the robbery planning meeting, and the house was only a mile and a half from the bank. *Id.*

The authorities contacted Jack Mitchell, the property manager from Strong Tower Investments LLC, which owned the residence on Buchanan Street. *Id.* Mr. Mitchell told them Gist-Holden and his girlfriend had rented the property since September 2019, and were significantly behind on their rent. [*Id.* at 7.] A few days after

6

the robbery, Gist-Holden sent an e-mail to the property management company, saying "our business is picking back up and we can have half if not all of the rent that owed paid by no later than July 15th." We should be able to start making payments again by the end of this month." *Id.* The property management company indicated the balance owed on the apartment was $6,219.01. *Id.*

Based on Agent Chonowki's affidavit, the authorities obtained a search warrant to search the residence. Gist-Holden claims a number of facts should have been included: eyewitnesses saw two suspects running away from the scene; the officers found footprints at approximately 3:52 p.m., apprehended King at 4:04 p.m., discovered a second set of footprints, and then they found a wet t-shirt; Gist-Holden was not just a coach or player, but also the owner of the Panthers; and the affidavit states that Gist-Holden is 6 feet tall, but he is actually 5'8". [DE 42 at 2-4.]

I'm at a loss to see how any of these minor details affect whether there was probable cause to issue the warrant. First, it is clear from the face of the affidavit that the officers were searching for two suspects (the shooter, and the person who took the money) – whether or not eyewitnesses saw two people fleeing on foot does not have any bearing on anything. *See United States v. Bacon*, 991 F.3d 835, 841 (7th Cir. 2021) (finding no error in denial of *Franks* hearing because omissions were immaterial as they were "clear from the face of the affidavit."). "[A] police officer applying for a search warrant must always select, deliberately, which information about an investigation to give the judge and which information to leave out." *McMurtrey*, 704 F.3d at 511 n.5. I

just don't see how the fact that witnesses saw two suspects running affects probable cause for the Buchanan residence to be searched.  If anything, this detail corroborates King's account that he had an accomplice.

Similarly, the fact that Gist-Holden was the football team owner rather than just a coach is a meaningless detail.  *See United States v. Norris*, 640 F.3d 295, 302 (7th Cir. 2011) ("[T]he facts withheld also must be 'material' to the probable cause determination.").  Again, if anything, this crumb could potentially corroborate the government's theory that Gist-Holden allegedly participated in the bank robbery because he needed money to pay the hotel where the team was staying.

Likewise, the difference between Gist-Holden's alleged actual height of 5'8" and his height as stated in the affidavit being 6 feet tall is just a small discrepancy.[1]  *See Johnson*, 580 F.3d at 671 ("mistakes were minor enough to have been innocent" and didn't satisfy *Franks* standard).  First of all, the affidavit stated that Gist-Holden's height is listed as 6' *on his football roster.* [DE 97-1 at 5.]  Gist-Holden himself concedes that his "listed height under a football profile is 6' to attract professional scouts." [DE 42 at 3.] Plus he told authorities during his interview in Georgia that he was six feet tall, and he self reported a height of six feet tall to the nurse at Lowndes County Jail. [DE 98

---

[1] In his reply, Gist-Holden moves off of the six foot figure, and claims "[a]gents knew that eyewitnesses stated the suspects were about 6'2." [DE 108 at 3.]  He provides no evidence in support of this statement.  Even if there is evidence that some witnesses stated the suspect was about 6'2", I still don't think this is a material difference that shows an intentional misstatement in the affidavit.

(manual filing), file ending in -34, at 19:32[2]; DE 102-2 at 3.] Even if he is right that he is actually 5'8", this is not material, and there is no evidence whatsoever that the officer recklessly or deliberately mis-stated his height. *See United States v. Maro,* 272 F.3d 817, 822 (7th Cir. 2001) (holding that conflicting physical descriptions and weight estimates were not significant enough to require a *Franks* hearing).

Gist-Holden also argues that King lied to the authorities when he told them he left his phone in his room at the hotel, and the affiant purposely omitted the fact that King lied. [DE 42 at 4.] This seems to be the phone that King used to take the picture at the Buchanan house, that was ultimately texted to King's friend. Whether or not King had the phone (or if he lied to the authorities about the phone's whereabouts) is speculation. Gist-Holden provides no evidence whatsoever in support of his assertion that King really had his phone. Moreover, it seems to be a distinction without a difference about where the phone was — if anything, the issue is just whether King actually took a picture with it of the alleged meeting planning the robbery.

---

[2] The government provided a copy of the interview tapes from the Lowndes County Jail. The security camera video footage is broken up into different files presumably due to the length of the interrogation, which spanned several days. There is video footage from the interrogation room on June 18, 2021 (8 segments total), June 19, 2021 (5 segments total), and June 21, 2021 (4 segments total, although some of these are just of a darkened room). The government also provided the audio associated with the prison hallway, where Gist-Holden made several statements as well. I have reviewed all of these tapes, and I note that the sound is often difficult to fully hear (especially in the interview room), but I have done my level best to review everything the government has provided to me. In its citations, the government designated each video by the last two numbers in the video title, and I will too for the sake of consistency. Additionally, the times are based on the elapsed time in a particular video segment (rather than the time stamp, which is in military time across the top).

Over and over again in his motion(s), Gist-Holden accuses King of being a liar. The two main problems with this argument is that: (1) Gist-Holden has provided no evidence in support of this assertion; and (2) there was no reason for Agent Chonowski to be aware of these purported lies, or any evidence that he was reckless in ignoring evidence that King was lying. *See Johnson*, 580 F.3d at 670. The same goes for Gist-Holden's protestations against the property manager (who he claims is lying because he was not behind on the rent) and the hotel owners (who he contends were lying because he does not owe them money) – these all fail because there is simply no "obvious reason to doubt the truth." *United States v. Woodfork*, 999 F.3d 511, 518 (7th Cir. 2021) (no hearing necessary where no suggestion in record that affiant had obvious reason to doubt the truth of his testimony before the issuing judge); *Johnson*, 580 F.3d at 671 ("If [defendant] believes that [the affiant] lied, he must support that allegation with an offer of proof, *see Franks*, 438 U.S. at 171, which he has not done.").

Gist-Holden additionally claims "King and his associate did not commit their crimes because of a hotel that was consistently paid for every day without issue." [DE 42 at 4.] He continues to argue in his reply that the hotel was paid in full. [DE 108 at 5; *see* 108-1 at 1 (a document showing a confirmation number for a reservation at the Holiday Inn Express, but no details about payment)]. While this argument (and others Gist-Holden makes) might certainly be relevant at trial relating to motive, this detail about the hotel has no bearing on the propriety of the search warrant at issue—it simply is not material when considering whether the affidavit contains a material

misstatement, included intentionally.  Indeed, the affidavit only states that "King also stated that, prior to the robbery, he had texted a friend, Travis Mogene, that he did not want to take part in the robbery and that they were doing it to pay for the hotel." [DE 97-1 at 5.] The affidavit does not include information about whether the hotel payments were actually late or not, and thus there is no obvious falsehood.

The affidavit states that the owner of the Buchanan residence was contacted on June 15, 2021, but Gist-Holden claims this is false, and he was contacted before that date. [DE 42 at 6.] Again, the exact date the property manager was contacted is immaterial.  Gist-Holden also argues that his girlfriend didn't know about the robbery, and the search warrant purposefully omitted the fact that King texted another individual the picture[3], and when that person asked if Ms. White knew what was going on, King responded that she did not. [DE 42 at 5.]  But this has no relation to whether there was probable cause to search the Buchanan residence, because, regardless of any potential involvement of Gist-Holden's girlfriend, there was probable cause to search that premises because Gist-Holden lived there.  That picture, taken in the Buchanan residence, depicted someone on the couch with a sling over their shoulder that matched the sling visible in the video of the robbery.  Although Gist-Holden contends the friend, Mogene, knew the photo was not of Gist-Holden [DE 42 at 5], the affidavit states that

---

[3] The government refers to this picture at the Buchanan residence as reflecting "planning the robbery." [DE 97 at 20.] Gist-Holden is adamant that "there was no 'meeting' at the Buchanan Street residence of any kind" and certainly not a planning meeting. [DE 108 at 5.] To be fair, going forward, I'll just refer to this as the picture taken at the Buchanan Street residence.

the officers reviewed the photo and that the individual on the couch was "likely" Gist-Holden. [DE 97-1 at 6.]  Gist-Holden has provided no evidence to support his belief that this conclusion was false, or that the agent intentionally included this information with a reckless disregard for the truth.

It is clear that Gist-Holden believes the agents should have put in more work investigating King and his friend, who he contends set him up.  But arguing the authorities could have (or should have) done more doesn't necessitate a *Franks* hearing. *See, e.g., United States v. Slizewski*, 809 F.3d 382, 385 (7th Cir. 2016) (finding affiant's mistake in describing the type of basketball shoes, and the defendant's argument that he could have learned the difference in shoes, didn't justify a *Franks* hearing); *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000) (describing allegation that "investigators should have done more work" as insufficient to meet "high standard required for convening a *Franks* hearing."); *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) ("[t]he fact that [defendant] can point out additional things which could have been done but were not does not in any way detract from what was done.").

In sum, Gist-Holden has not showed any material discrepancy in the affidavit for the Buchanan street residence search warrant that is relevant to the probable cause determination and that Agent Chonowski was aware of or should have known was inaccurate at the time he filed the affidavit.  For all of these reasons articulated, this motion for a *Franks* hearing is denied.

**B.     Second *Franks* Motion – Search Records and Location Information for Phone Number Ending in -1806**

The second motion filed by Gist-Holden requesting a *Franks* hearing relates to an affidavit drafted by FBI Task Force Officer Chris Gootee in support of a search warrant involving a cellular telephone number. [DE 43.] The purpose of the affidavit was to obtain the location of a cell phone Officer Gootee believed was being used by Gist-Holden.  The affidavit was drafted on June 16, 2021, 5 days after the robbery, when Gist-Holden was still at large. [DE 97-2.] The affidavit recounts that on June 16, 2021, a criminal complaint was filed against Gist-Holden alleging he committed the offense of possession with intent to distribute marijuana, and that a warrant was out for his arrest. [*Id.* at 5.]  Obtaining the whereabouts of Gist-Holden's cell phone was an effort to locate Gist-Holden to arrest him.

As with Gist-Holden's first motion, in this second one, he attempts to point out a number of inaccuracies in the affidavit, but they are all either completely immaterial and/or completely unsupported.  He argues: the telephone was registered as a business so other people were associated with it; the officers lied about the quantity of marijuana they found in his home; Gist-Holden had rented a U-Haul on June 12, 2021; and he disputes the details about when the U-Haul broke down and from what town he tried to rent another U-Haul. [DE 43 at 2-4.]

Whether Gist-Holden was the sole user of the phone at issue has no bearing on the statement in the affidavit that the officer had probable cause to believe Gist-Holden had the phone and was using it to communicate with U-Haul.  Similarly, the potential

13

discrepancy about exactly how much marijuana was recovered from his residence is irrelevant because there was indeed an arrest warrant out for Gist-Holden for possession with intent to distribute marijuana.  Moreover, Gist-Holden has provided no evidence in support that the actual number of plants, or weight of drugs recovered, was inaccurately recorded.  Whether his U-Haul broke down in Gainesville, Florida, or another town in Florida, also has no bearing on the probable cause analysis.  The authorities were trying to track him down—it is not surprising that they did not know his exact whereabouts at the time the affidavit was executed.

Once again, Gist-Holden has not made a substantial preliminary showing that the alleged erroneous statements in the affidavit were material to the probable cause determination, much less showed that any of the statements were actually incorrect. Taking the totality of the circumstances into consideration, I believe there was a fair probability that the search warrant would lead the authorities to Gist-Holden, who had a warrant out for his arrest.

**C.    Third *Franks* Motion – Search Records and Location Information for Phone Number Ending in -9762**

The third motion filed by Gist-Holden requesting a *Franks* hearing relates to another cellular telephone number. [DE 47.] This affidavit was drafted by FBI Special Agent Jacob McAdams on June 12, 2021 (one day after the robbery). [DE 97-3.] It differentiates from the other affidavit to search a cell phone in that this one lays out the details relating to the robbery and the apprehension of King. [*Id.* at 4-5.] The affidavit also states that during King's interview, he admitted to participating in the robbery, but

14

stated he did not shoot the security guard. [*Id.* at 6.] King identified Hailey as his accomplice, and the person who shot the security guard. *Id.*

Presumably in an effort to locate Gist-Holden, the authorities discovered that he participated in a transaction with a pawn shop in Calumet City, and that he gave the target phone number ending in -9762 as part of that transaction. [*Id.* at 7.] They then checked the law enforcement databases, which "showed that the Target Telephone was attributable to Gist-Holden." *Id.*

Gist-Holden re-hashes several arguments he made in his first motion: King lied; he was not just a coach but actually the owner of the minor league football team; and the affidavit omits the information that witnesses told the officers they saw two suspects running. [DE 47 at 3-4.]  These argument have already been addressed and rejected—they don't require a *Franks* hearing.

For the first time, Gist-Holden argues the affidavit should have included more detail about his history with the pawn shop because it "was to mislead the magistrate judge into falsely believing a ton of items were pawned and there was a desperate need for money." [DE 47 at 5.] But the relevant part of the affidavit is not disputed—that Gist-Holden gave this telephone number during a transaction; thus, there was probable cause for the authorities to believe that they would find Gist-Holden if they located this phone.  *See, e.g., United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016) ("A fugitive cannot be picky about how he is run to ground.").  Gist-Holden also has qualms with the agents supposedly having to look up information about him, he alleges that one of

15

the weapons found was registered to his girlfriend, Briana White (but stolen from their

residence), and it bothers him that King didn't identify him in a lineup until he was in

custody for about 8-9 hours. [DE 47 at 5-6.] None of these accusations affect probable

cause to conduct a location search on a phone to locate Gist-Holden, who was still at

large.  The timing of King's photo identification has no relevancy, as King allegedly

personally knew Gist-Holden so presumably he could have picked his photograph out

of a lineup whenever.

For all the reasons articulated above in relation to all three motions for a *Franks*

hearing [DE 42, 43, 47], I find sufficient probable cause for all three search warrants to

be issued.  Gist-Holden has failed to show that the warrant applications contained

material misstatements or omissions that would alter the probable cause determination,

and that any such information was included or omitted intentionally or with a reckless

disregard of the truth.

## II.     Motion to Dismiss The Indictment

Aside from the motions for a *Franks* hearing that I've already addressed, Gist-

Holden also filed a motion to dismiss all charges against him and, for good measure,

two amendments to the motion to boot.  [DE 51, 68, 84.] Gist-Holden first argues that

his *Miranda* rights were violated when he was interrogated at the Lowndes County Jail

in Georgia (where he was finally apprehended). [DE 51 at 1-3.] I will address these

arguments later in this opinion, as they are also made in his motion to suppress.  Gist-

Holden also argues that the claims against him should be dismissed based on alleged

perjury by the witnesses in front of the grand jury.  He contends "not one, not two, but all witnesses provided false, coerced, or altered testimony that was presented to the Grand Jury." [DE 51 at 7.]

A prosecutor's knowing presentation of false testimony to a grand jury violates a defendant's Fifth Amendment right to due process.  *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) (the government may not knowingly present false testimony).  However, an indictment should only be dismissed if the defendant can show the prosecutor presented evidence it knew was inaccurate and "the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)).  In other words, any misconduct must result in prejudice to the defendant.  There must be a "concrete basis" for supporting such claims and "[a]ccusations of misconduct based on unsupported suspicion or patently frivolous contentions should not be deemed 'claims' sufficient to require further inquiry. . . ."  *Matter of Special April 1977 Jury*, 587 F.2d 889, 892 (7th Cir. 1978).

Unsupported suspicion is all Gist-Holden has set forth.  He generally thinks multiple witnesses lied, the federal agents gathered and coerced false testimony, and then presented that testimony to the grand jury.  As the government points out, Gist-Holden has not even received the grand jury transcripts yet (as *Jencks* materials), and

therefore he has not (and cannot) point to false testimony actually presented to the grand jury because he has no first -hand knowledge of that proceeding at this point in the case.  Thus, he hasn't identified any alleged perjury that was actually committed, or offered any evidence establishing the false nature of any statements.  *See United States v. Burton*, No. 15-CR-312, 2017 WL 2559034, at *4 (N.D. Ill. June 13, 2017) (finding where court did not have the grand jury transcripts before it, and defendant had not established how the grand jury's decision to indict was substantially influenced by alleged false testimony, the indictment should not be dismissed).  Here, Gist-Holden has not identified actual false testimony at the grand jury proceeding, or provided support for why it is allegedly false, or articulated how the supposed false testimony substantially affected the grand jury's decision to indict.

To the extent Gist-Holden argues in his first amendment to the motion to dismiss that the indictment should be dismissed because the prosecutor failed to produce exculpatory evidence [DE 68 at 1-2], it is firmly established that the government need not provide exculpatory evidence to the grand jury.  *United States v. Williams*, 504 U.S. 36, 51-52 (1992) ("the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge . . . the suspect under investigation by the grand jury [has never] been thought to have a right to testify or to have exculpatory evidence presented.").

Finally, Gist-Holden argues in his second amendment to the motion to dismiss that the indictment should be dismissed because the video recordings of his

interrogations have obviously been altered and edited. [DE 84 at 1-2.] He argues this again in his reply memorandum, contending the "interrogation videos were tampered with and altered"—he believes certain segments were removed and others re-recorded over. [DE 106 at 2, 7.] Gist-Holden claims the file was edited 25 times over the course of two months, and the government deleted out of the video the parts where he invoked his right to counsel. [DE 108 at 9.]

Gist-Holden has not provided the court with any proof as to how the video has supposedly been altered.  He attaches a page as an exhibit [DE 108-1 at 2], which has columns—a file number on the left, a date modified, the type of file (JPEG image or video clip), and the size.  But there is nothing on the face of this document (which I have no context for, and do not fully understand the foundation), that supports a finding that the tapes were tampered with.  During a court proceeding held before me on November 5, 2021, the government stated that because the video recording spanned approximately 9 hours, it had to be broken up into multiple files, but they represented to the court that they had produced the entirety of the video.  In its response, the government states that the video initially produced to Gist-Holden had different metadata (to make it more easily playable) than the original interrogation recording, but "Defendant now has the complete interview in its original, native format." [DE 97 at 17.]  Therefore, with the evidence I have before me right now, there seems to be no wrongdoing by the government, and because Gist-Holden has not presented specific evidence calling into question the government's representations, this also does not require dismissal. If,

19

hypothetically, Gist-Holden uncovers specific facts during discovery that show the videos were altered, at trial, he could certainly move to exclude the evidence as inadmissible.

For all of these reasons, the motion to dismiss the indictment and the associated amendments to the motion to dismiss [DE 51, 68, 84] are all denied.

## III.    Motion to Dismiss for Lack of Jurisdiction

Gist-Holden has also filed another motion to dismiss, arguing his case should be dismissed for lack of "special maritime and territorial jurisdiction." [DE 67.]  Gist-Holden's argument is difficult to follow, but he seems to contend I lack jurisdiction because the charges against him are all false, he didn't commit any crime, and there is no territorial jurisdiction over the place of the alleged crimes. [*Id.* at 1-3.]

This motion completely misses the mark.  Title 18 U.S.C. § 3231 provides "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  The superseding indictment alleges Gist-Holden committed an armed robbery in the Northern District of Indiana in violation of 18 U.S.C. 2113(a) and (d), and 18 U.S.C. § 2, and brandished and discharged the firearm in the course of the robbery causing the death of Richard Castellana, in violation of 18 U.S.C. § 924(c)(1)(A) and (j), and 18 U.S.C. § 2. [DE 20.]  These charged offenses against the laws of the United States grant this court proper jurisdiction.  Whether Gist-Holden is actually innocent of these charges is an issue for the jury to decide, but that does not affect the jurisdiction of this court.

## IV.    Motions to Suppress

Gist-Holden has also filed a motion to suppress evidence and an amendment to the motion to suppress [DE 41, 69].  But some of the suppression related arguments are also contained in his motion to dismiss. [DE 51 at 1-3; DE 84 at 2.]  I note that neither Gist-Holden nor the government requested a hearing on the motion to suppress.  So I'll decide it on the briefs. Gist-Holden sets forth several different arguments in these motions, which I will address in turn, but the focus is on the custodial statements he gave to the authorities while he was being held in Georgia.

Boiled to their essence, he has two arguments.  First, he claims the statements he made were not voluntary. Gist-Holden contends the statements he made during the interrogations were involuntary because: he suffered head injuries and trauma from the car accident that followed the high speed chase, was denied being evaluated by a doctor, and eventually passed out in his cell from head injuries due to the accident; and he was subjected to abnormal treatment by being forced to go into a solitary confinement cell and strip naked. His second argument is that his repeated references to a lawyer during the interview required the questioning to cease and that anything obtained by the government after his invocation of his right to counsel must be suppressed.  I'll take up each of these arguments in turn below.  But first, a detailed accounting of the lengthy interview is necessary to provide context.

Recall that the robbery occurred on June 11, 2021, in Gary, Indiana.  Although King was apprehended nearby, the other suspect escaped.  Records from the Lowndes

County Sheriff's Office show that there was a warrant out for Gist-Holden's arrest for possession with the intent to distribute marijuana and there was a detainer out for him. [DE 102-1 at 5-7.]  Gist-Holden was arrested in Georgia late in the evening of June 17, 2021[4], following a high-speed chase in which he crashed his vehicle. [DE 102-1 at 5.] He was detained at the Lowndes County jail pursuant to the detainer and the state driving and fleeing charges. [*Id.* at 1-3.]

While at the jail, a Licensed Practical Nurse initially took Gist-Holden's medical history. [DE 102-2.]  The nurse noted that Gist-Holden reported being involved in a motor vehicle accident prior to arrest, but he "denies any injury or concerns.  No visible injuries or distress." [*Id.* at 7.]  She also conducted some kind of screening questions, which showed no need for urgent or emergency medical treatment—Gist-Holden was alert, did not appear to be under the influence of alcohol or drugs, and otherwise presented with no medical problems. [*Id.* at 3, 5, 7.]  Later on that morning of June 19, 2021, a different person saw Gist-Holden at 6:19 a.m. and found he had no complaints, no significant physical signs were noted, he was alert, oriented and responsive. [*Id.* at 11.]

---

[4] Gist-Holden takes issue with when Juneteenth (the federal holiday) actually occurred. [DE 106 at 3.]  On June 17, 2021, President Biden proclaimed Saturday June 19, 2021, as Juneteenth Day of Observance. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/18/a-proc lamation-on-juneteenth-day-of-observance-2021.  However, because that fell on a Saturday, some government agencies observed the holiday on Friday June 18, 2021 (and some stayed open that Friday due to the late notice). https://www.npr.org/2021/06/18/1008095439/juneteenth-is-a-federal-holiday -now-but-what-that-means-for-workers-varies-widely

Gist-Holden was also screened for COVID-19 symptoms since he was arrested during the pandemic. [DE 102-2 at 1.] There is a notation in the records that at 6:26 a.m. on June 18, 2021, Gist-Holden was placed in a "medical cell . . . watch per security/charges." [*Id.* at 15.] He was stripped, searched by security, and given a safety smock. *Id.* Gist-Holden denied any medical concerns, and no visible distress was noted. *Id.* The records also indicate that later he was placed on "suicide watch, medical isolation." [*Id.* at 9.]

After Gist-Holden was apprehended in Georgia, the law enforcement officers who were investigating the Indiana robbery and murder made their way down to Georgia to interview him. On June 18, 2021, at approximately 4:45 p.m., Georgia FBI Agent Matt Wagner brought Gist-Holden into an interview room that had a video camera, four chairs, and a table. [-34.] A second agent joined them shortly. In response to Gist-Holden's question if "[t]hey're here now," the agent said, "no, they're on their way." [-34 at :08.] The agent offered Gist-Holden water and a sandwich, which he accepted. The agent reiterated that he was law enforcement, and more were coming from Indiana. [-34 at :30.] He also explained that Gist-Holden had a criminal complaint filed against him, told him the nature of the marijuana drug charge, and explained the process of the government getting an arrest warrant. [-34 at 1:30.] He also explained Gist-Holden's right to be brought before a magistrate judge to be arraigned. [-34 at 3:30.] Agent Wagner explained that the judge would have needed probable cause to issue the warrant. Then, he covered the Rule 5 written waiver concerning the initial

appearance.

At that point, before he signed anything, Gist-Holden asked, "Is there an attorney that you can appoint me now?" [-34 at 6:18.]  Gist-Holden then said that he was willing to talk to them, but was there anyone who could counsel him right now, by the time they got there? [-34 at 6:19.] The Agent sought to clarify by explaining that he didn't think they could get an attorney there right now, but that part of Gist-Holden's rights was that he did not have to speak unless he had an attorney present, and that Gist-Holden could go back to his jail cell right then, and he had the right not to talk to them. [-34 at 6:30.] Gist-Holden then asked, "Can y'all help me, or this is just to like, like screw me over with all that's already going on?" [-34 at 7:00.]  The Agent responded, "I don't know all that's going on because, again, I'm from here, you're not from here, I don't know all the circumstances" but he said Gist-Holden would have to determine if he wanted to sign this form, and after that, they would read him his *Miranda* rights, and then he would have to decide if he wanted to speak with them or not. [-34 at 7:05.]

Gist-Holden then continued to talk to the agent.  Agent Wagner then read the waiver form in its entirety and asked Gist-Holden if he had any questions.  Gist-Holden then said something to the effect if he agrees to talk, and there are questions he prefers not to answer without a lawyer, he didn't have to answer those questions? [-34 at 10:41.] And the agent responded, "absolutely." [-34 at 10:51.] After further discussion, Gist-Holden signed the waiver. [-34 at 15:27.]

Then, the agents and Gist-Holden sat around small-talking awaiting the arrival

of the agents from Indiana—they covered football formations, family life, his football injuries, the Olympics, and other day to day chit chat.  Gist-Holden then left the interrogation room to use the bathroom. [-32 at 50.]  When Gist-Holden returned, he was joined by FBI Agent Chonowski and FBI Task Force Office Chris Gootee, the agents from Indiana. [-32 at 53:53.] Agent Wagner then said he was going to read Gist-Holden his *Miranda* rights, and he was welcome to answer as many questions as he wanted or as few as he wanted. [-32 at 54:40.] Agent Wagner then read the *Miranda* document/rights. [-32 at 55:00.]  Gist-Holden reviewed the document himself, again made a comment about if it was too late to get an attorney, Agent Wagner said at this point he didn't think they could get an attorney that night (it was approximately 6 pm), but he could not answer any questions, or if he was going to answer questions tonight, this would be the format, and at some point if Gist-Holden decided to get counsel, he could do that later. [-32 at 56:20.] Agent Chonowski then asked Gist-Holden whether he was sure he understood that this document meant that he was agreeing to talk to them without counsel. [-32 at 56:58.] Gist-Holden then signed the *Miranda* document.

For a long time during the interrogation, Gist-Holden denied any involvement with the robbery.  Then, Gist-Holden seemed to say that he had information for the officers, and asked how long he "would have to do this for, that I work this off" [-02 at 59:40], an obvious reference to trying to cooperate and get some reduced sentence or charges dropped altogether as a result.

The three agents proceeded to question Gist-Holden that night until

approximately 11:30 p.m., when he was returned to his cell.  At one point earlier in the night, Gist-Holden asked to speak to an agent in the hallway, and his request was allowed.  As I mentioned before, there is a recording of some conversations in the hallway as well.  Gist-Holden indicated a willingness to cooperate with the government, and asked if they could help him "work it off." [Hall, 2:10-38.] At one point, it is difficult to hear, but it sounds like Gist-Holden says, "I want a lawyer to assist." [Hall, 5:14.] The agent asked "with what?" and Gist-Holden indicates he wants a lawyer for the government to help *him* (presumably, he is referring to some kind of assistance in working out a deal). [Hall, 5:20.]  The agent then reminded Gist-Holden that they read him his rights before. [Hall, 5:29.]

Gist-Holden was brought back into a different interview room at about 10:45 a.m. the next morning, June 19th. [-54.] The theme of Gist-Holden wanting to cooperate, or give the agents some information in return for something, continued.  Gist-Holden asked to have an unrecorded conversation with the agents (and turn the audio off), but the agents said they couldn't do that for his own protection, and theirs. [-21 at 18:10.] At one point, Gist-Holden stated, "what would an attorney say?" and the agents responded they didn't know, but handed Gist-Holden his *Miranda* rights that he signed the day before. [-58 at 3:59.]  Gist-Holden asked to call his mother, and an agent gave him his cell phone and allowed him to talk to his mom. [-58 at 14:39.] Gist-Holden also called Briana White from the interrogation room, and their conversation was recorded as well. [-58 at 25:13.]

26

Around noon on June 19th, Agent Gootee asked Gist-Holden if he wanted to start working towards a deal, or an adversarial process. [-39 at 21:05.] Gist-Holden responded, "I don't want to do the adversarial process, I like, I need to be getting a lawyer.  Somebody that will know for sure like, that, you know, that, that XYZ." [-39 at 21:20.] Agent Gootee said, "you haven't asked for one," and Agent Chonowski referred Gist-Holden to his written *Miranda* waiver and said, "that still applies," and those are your rights. [-39 at 21:30.] Then, Gist-Holden asked whether they would be here "when I have a lawyer." [-39 at 21:58.]  Gist-Holden later asked, "would an attorney be able to get me the deal?" and Gootee answered, "I can't give you any legal advice" and "we could get you an attorney." [-39 at 23:30.]

Around 12:30 p.m. that day (June 19), Gist-Holden brought up the possibility of getting counsel, and Agent Gootee told him that he needed to be clear. [-18 11:7.] Agent Chonowski told him, "you just ask for it and we get it, we stop talking to you." [-18 at 11:10.] Agent Gootee, obviously aware that Gist-Holden had made a number of elliptical references to a lawyer, decided to seek clarification on the issue once and for all.  Agent Gootee asked, "are you saying you want a lawyer, yes or no?" and then, "do you want a lawyer right now, yes or no?" and Gist-Holden answered "yes." [-18 at 11:20, 12:17.]  Gist-Holden then expressed that he thought there was no possibility of getting a lawyer earlier since it was a holiday yesterday, and Agent Chonowski assured him they would have stopped talking to him if he had asked for a lawyer then, and referred to similar language in the *Miranda* waiver. [-18 at 12:00.] The Indiana agents

then immediately stopped asking questions, packed up their belongings, and left.

Gist-Holden's medical records indicate that around 5:23 p.m. on June 19, 2021, an officer was advised that Gist-Holden was on the floor, unresponsive in his cell. [DE 102-2 at 17.] A member of the medical staff witnessed him "on floor in supine, green smock intact, respirations even and unlabored, no distress noted, writer advised inmate to [get] up, inmate's closed his eyes tighter and ignored nurse, writer attempted to lift inmate's right arm up and inmate guided his arm down to prevent it from hitting him, writer then advised inmate to get up.  Inmate advised writer that he wanted to lay down." *Id.*  He was then moved to a different cell for observation, told to call for help if he needed anything, and was subject to additional monitoring.  *Id.*  Three hours later, at 8:50 p.m., Gist-Holden was responsive, had no medical complaints, and no obvious distress, although he refused to have his vitals taken.  *Id.*  Gist-Holden did not have any medical complaints or signs of distress during any wellness checks over the next two days.  *Id.*

The next video recordings were taken on June 21, 2021, and deal with the Georgia agent asking for Gist-Holden's authority to search a vehicle for some keys, and explaining his initial appearance. [-50, -38.]  Gist-Holden was not asked questions on June 21, 2022 relating to the robbery, and the government states it does not intend to introduce any statements Gist-Holden made that day. [DE 100 at 6.]

### A.      Voluntariness

A confession[5] is voluntary if, considering the totality of the circumstances, it is the "product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)).  In deciding whether a confession was voluntary, courts assess "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017)(quotation omitted).  "Coercive police activity is a 'necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Dillon*, 150 F.3d at 757 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  In other words, a defendant arguing his confession was involuntary "must show that the police engaged in coercive practices." *Dassey*, 877 F.3d at 303.

Ultimately, the government must prove by a preponderance of evidence that a defendant's confession was voluntary. *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012).  But, it is important to note that Gist-Holden must present "definite, specific,

---

[5] As an aside, the government refers to Gist-Holden's statement as a "confession." Many cases use the same term.  Aside from setting forth the applicable law regarding the voluntariness of confessions, I will generally just refer to the "statements" Gist-Holden made during the interrogations.  It is up to the jury to decide the interpretation of these statements, and whether the statements constitute a "confession" is not my purview.

detailed and nonconjectural facts" to establish "a disputed issue of material fact as to the voluntariness of his confession." *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004).

In determining voluntariness, and determining whether Gist-Holden's "will was in fact overborne," *Miller v. Fenton*, 474 U.S. 104, 116 (1985), I should look at the characteristics of Gist-Holden, the details of the interrogation (including the setting and whether any tactics were used), any vulnerabilities of Gist-Holden, his age, intelligence, education, and familiarity with the criminal justice system. *Dassey*, 877 F.3d at 303-05.

Here, Gist-Holden has not showed that the agents engaged in coercive practices. I have watched all of the lengthy video clips. The agents spoke in respectful tones (they did not yell or raise their voices, or threaten Gist-Holden), they brought him food and water, they gave Gist-Holden restroom breaks, and they allowed him to call his mother and girlfriend from one of their cell phones. At one point, Agent Gootee, while remaining seated, was sort of leaning towards Gist-Holden, trying to get information out of him, and when Gist-Holden said something like "I feel like you are trying to back me in the corner," Gootee said that was not his intent, and immediately scooted his chair backwards. [-31 at 23:35.] Nothing about the agents' actions gives me any pause.

In considering the characteristics of Gist-Holden, he is a 25 year old man who during the proceeding held before me to go pro se, told me he had a masters degree in criminal justice and studied one year of law school. [Hrg., Nov. 5, 2021.] Gist-Holden is clearly very intelligent. He was articulate, coherent, asked intelligent questions, and

answered them in a very cogent manner.  Overall, he seemed calm during the questioning. There is nothing in his personal characteristics to show that he was vulnerable, or his will might have been overcome.  To the contrary, he seemed entirely able to conduct himself in an intelligent fashion during the interviews.

Gist-Holden argues that he suffered from a head injury from the car accident, and that rendered his statements involuntary.  There are several problems with this argument.  First, there are medical records from the jail showing that Gist-Holden made no medical complaints, he denied injury, he was in no visible distress, and he appeared alert and responsive. [DE 102-2 at 3, 5, 7, 11.]  Gist-Holden disputes this, insisting he told the nurse his head was hurting from the accident [DE 106 at 4], but he has nothing to corroborate this.  He points to something crossed out on the jail form.  *Id.*  Originally, it looks like the nurse wrote "MVA - ∅ distress" but then that is crossed out, and above it written "error" and the initials JS. [DE 102-2 at 7.]  Then, it states "I/M reports involved in MVA prior to arrest.  Denies any injuries or concerns.  No visible injuries or distress.  Cleared by EMS & SGMC per __ [the last few letters I cannot read]." *Id.* Despite the fact that the portion stating "MVA - ∅ distress" (which could be interpreted as stating no distress) is crossed out, the entry nonetheless continues to state that Gist-Holden denied any injuries or concerns.  Moreover, my impression from watching the video is the same as those recorded by the jail staff – Gist-Holden appeared to be healthy, in no medical distress, he made no complaints about his health during the interviews, and at no time during the recordings did he ask for medical attention.

Second, and maybe more importantly, Gist-Holden does not explain why his alleged injuries affected the voluntariness of his statements. He has presented no evidence that he suffered injury, but even if he did, a head injury in and of itself does not mean that his statements were involuntary. *See United States v. Harper*, 466 F.3d 634, 643-44 (8th Cir. 2006) (voluntary confession even after car accident rendered the defendant unconscious).

To the extent Gist-Holden is relying on the incident where he was found lying on the floor of his cell (but soon thereafter found responsive), this event occurred later on June 19, 2021, after Gist-Holden already was interrogated and answered questions. Thus I don't know how this could be relevant to the voluntariness of his statements made earlier that day.

Gist-Holden also asserts that putting him in isolation at the jail constituted a coercive tactic. He was arrested during the COVID-19 pandemic and the jail records indicate he was put in isolation in a medical cell "per security/charges." [DE 102-2 at 15.] The records also indicate that later he was placed on "suicide watch, medical isolation." [*Id.* at 9.] But none of this strikes me as coercive. It makes sense that the jail would want to isolate him due to the concern of a new prisoner potentially spreading COVID-19, and that he be placed on suicide watch after the nature of the charges came to light. The fact that he was in isolation does not render his confession involuntary. *See United States v. Giles*, 935 F.3d 553, 557 (7th Cir. 2019). Moreover, Gist-Holden provides no evidence of (and at no point did I hear) any agent use his isolation as a

bargaining chip for a confession.

Gist-Holden also mentions the length of the interviews, implying his statements were involuntary due to the length of the interrogation.  While it is true the two days of interviews spanned a total time of approximately 9 hours, Gist-Holden did receive meals and breaks, and during some of that time he was calling his mother and girlfriend.  *See Janusiak v. Cooper*, 937 F.3d 880, 884, 894 (7th Cir. 2019) (finding interview session of approximately seven hours including breaks voluntary under the totality of the circumstances); *United States v. Smith*, 831 F.3d 793, 800 (7th Cir. 2016) ("It's true that the interrogation was lengthy, but she received meals and had regular breaks, so she cannot and does not argue that the conditions of the interrogation were coercive.").  Morever, Gist-Holden did not seem excessively over tired during the interviews, he displayed no signs of physical or mental exhaustion, but rather appeared alert the entire time and understood what was happening.  Any time he requested a break, he was given one.

Gist-Holden argues the number of officers present for his interviews indicates coercion.  While I agree I need to take this factor into account when looking at the totality of the circumstances, there is nothing amiss here.  Sometimes Gist-Holden was in the room with one agent, sometimes two, and at the most three other people were present (FBI Agent Gootee and Agent Chonowski from Indiana, and FBI Agent Wagner from Georgia).  There was enough space for everyone to remain seated the entire time, and no one stood over Gist-Holden or hovered over him, or physically intimidated him

whatsoever during the interviews.

Finally, Gist-Holden asserts that he "was told I could not use a phone to contact an attorney" when he first arrived in jail and there "wasn't a doctor to evaluate me." [DE 51 at 1.] Gist-Holden's unsupported statement about no doctor being available is contradicted by the jail records that show he was evaluated by a licensed nurse and determined to have no injuries plus, additionally, he denied injury. [DE 102-2 at 3, 5, 7.] It is difficult for me to fully evaluate Gist-Holden's claim that he was told he could not use a phone to contact an attorney since he has given me no context - who did he ask to call and attorney, and when? In *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004), the Seventh Circuit affirmed the denial of a motion to suppress where the defendant "provided no details about how he was tricked and confused, who may have tricked and confused him, or why this trickery and confusion rises to the level of coercion."). The same goes here with Gist-Holden's vague accusation that someone wouldn't let him use a phone. Moreover, it is evident from the video recordings that Gist-Holden was not completely isolated because he can be seen making calls to his mother and girlfriend from the interrogation room. To the extent Gist-Holden claims he was denied an attorney, that will be addressed in the next section.

To sum up this section, Gist-Holden's statements made to the authorities in Georgia were made voluntarily. There is no evidence of coercive police tactics and I cannot say that Gist-Holden's free will was overborne by any of the circumstances surrounding his statements.

34

**B.**     **The Fifth Amendment and the Right to Counsel**

Gist-Holden next contends his statements made during the interrogations should be suppressed because he asked for a lawyer. [DE 41 at 2.]  It is well settled that the Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. V.   The Supreme Court created a protective rule that requires officers to advise a suspect in custody of his rights to remain silent and to counsel before they start an interrogation.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  This was the impetus of the now infamous "Miranda warning."  This *Miranda* warning isn't required for all interactions between suspects and officers—only when the suspect is "in custody" and subject to "interrogation.*"  United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996); *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016).

Here, no one disputes that Gist-Holden was in custody and subject to interrogation (at least he was subject to interrogation after the Indiana agents arrived and began questioning him about the robbery).  The only real issue is if Gist-Holden actually invoked his right to counsel.  An interrogation may continue until the defendant "unambiguously," "unequivocal[ly]" and "clearly requests an attorney."  *Davis v. United States*, 512 U.S. 452, 460-62 (1994).  The court must decide whether the request was "sufficiently clear [] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id.* at 459.  This is an "objective inquiry."  *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009).

It is not enough to just make a reference to an attorney.  For example, the following statements have been found to *not* be sufficient enough to be an unequivocal request for an attorney: "Do I need a lawyer?" "Do you think I need an attorney here?" "Do you think I need an attorney?"  *United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) (collecting cases).  Nor is a "potential desire to consult with legal counsel" a proper invocation of right to counsel.  *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005); *see also United States v. Hunter*, 708 F.3d 938, 944 (7th Cir. 2013) (not a clear invocation to say "[i]f that's the case, then – then I might want to talk to an attorney" but "Can you call my attorney?" was sufficient); *United States v. Shabaz*, 579 F.3d 815, 818-19 (7th Cir. 2009) ("Am I going to be able to get an attorney?" did not constitute a "present desire to consult with counsel").

Similarly, if the defendant is just asking about "the process of obtaining an attorney rather than asking for counsel to be present during the interview," that is not a clear invocation.  *Subdiaz-Osorio v. Hupmrehys*, 947 F.3d 434, 442 (7th Cir. 2020).  This is especially true when the defendant "continued to answer questions and remain cooperative for the rest of the interview."  *Id.*  Thus, questions asking for "clarification of his right to counsel" are not invocations.  *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994).  In a case where the defendant made a fairly similar statement as those uttered by Gist-Holden, the Seventh Circuit found that "am I going to be able to get an attorney?" was not a clear request to alert a reasonable police officer that the defendant was requesting an attorney at that moment.  *Shabaz*, 579 F.3d at 818-19.

36

The "police are under no obligation to clarify an ambiguous statement by the accused." *Lee*, 413 F.3d at 625.  The Seventh Circuit has emphasized that officers are encouraged (but not required) to ask clarifying questions in response to ambiguous references to an attorney.  *United States v. Lee*, No. 21-2216, 2022 WL 193571, at *2 (7th Cir. Jan. 21, 2022) (referring to *Davis*, 512 U.S. at 461-62, finding "Do I need a lawyer?" and "I feel like I should have a lawyer" were not an unambiguous request for an attorney).

There are no magic words that a defendant must use to invoke counsel. Rather, the court is supposed to look at the defendant's words "as ordinary people would understand" them.  *Hunter*, 708 F.3d at 942.  The Seventh Circuit has recognized that usual, clear invocations of counsel "request an action (or permission to act); they are more than observations."  *United States v. Hampton*, 885 F.3d 1016, 1020 (7th Cir. 2018). Moreover, the court considers the statement itself and the surrounding context in determining whether a suspect clearly invoked the right to counsel.  *Wysiner*, 683 F.3d at 793-94.

The interview must stop when a defendant clearly and unambiguously invokes a present desire to consult with counsel; however, officers can talk to the defendant if "the accused himself initiates further communications, exchanges, or conversations with the police."  *United States v. Jackson*, 189 F.3d 502, 511 (7th Cir. 1999) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).  In other words, "before a suspect in custody can be subjected to further interrogation after he requests an attorney there

must be a showing that the 'suspect himself initiates dialogue with the authorities.'"
*Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (quoting *Wyrick v. Fields*, 459 U.S. 42, 45-46 (1982)).

Let's go through Gist-Holden's statements one by one and apply these legal foundations to them.

> 1.    **"Is there an attorney that you can appoint me now?  I mean, I'm willing to talk with these guys, but is there anybody that could counsel me right now by the time they get here?"**

Prior to being read his *Miranda* rights, and prior to the Indiana FBI agents arriving in Georgia, Agent Matt Wagner read Gist-Holden the Rule 5 waiver, explaining what would happen during an initial appearance.  As the agent was going through the waiver, Gist-Holden interrupted and asked, "Is there an attorney that you can appoint me now?  I mean, I'm willing to talk with these guys, but is there anybody that could counsel me right now by the time they get here?" [-34 at 6:18.]

Agent Wagner answered: "part of [defendant's] rights would be to not be questioned or not speak unless you have an attorney present.  Again, we – we don't think there's an opportunity to get an attorney here now, but in terms of your rights, you have the right to, to go back to your jail cell right now and, and not talk to me, or - or Bob, or - or the folks from Indiana.  That's certainly your right, and that's kind of what - kind of what, uh - what we're going through right here." [-34 at 6:20.] After a pause, Gist-Holden asked, "Can y'all help me, or this is just to like, like screw me over with all that's already going on?" The agent responded that "I don't know all that's

going on because, again, I'm from here . . . I don't know all the circumstances." [-34 at 7:05.]

Gist-Holden's first statement about if there is an attorney they could appoint him now before the Indiana agents arrive was not a clear and unambiguous request for present counsel.  First, in looking at the timing, the agents from Georgia were just covering the Rule 5 waiver and waiting for the Indiana agents to arrive.  The way Gist-Holden phrased his question seems like a question about the procedure of appointing a lawyer, or wanting to talk to a lawyer before the interviews (not a clear desire for a lawyer to be present *during* the questioning).  *See United States v. Thousand*, No. 13-2599, 558 F. App'x 666, 671-72 (7th Cir. 2014) ("I think I need a lawyer, I don't know, but I want to cooperate and talk" failed to express a clear, present desire to consult with counsel) *Subdiaz-Osorio*, 947 F.3d at 444 (finding question "how can I do to get an attorney here because I don't have enough to afford for one?" was asking about the process of obtaining an attorney rather than asking for counsel to be present during the interview and therefore the officers could continue to question him); *Shabaz*, 579 F.3d at 818 ("am I going to be able to get an attorney?" was not a clear invocation); *Soffar v. Cockrell*, 300 F.3d 588, 595 (5th Cir. 2002) ("[A] suspect's question about how to obtain an attorney does not constitute an unambiguous assertion of his right," collecting cases).  This might seem like splitting hairs, but Gist-Holden seems to indicate he would like an attorney to counsel him before the interrogation (not to be present during the questioning).

And then, because Gist-Holden immediately says that he was willing to talk to the authorities, that makes his previous statement even more ambiguous and equivocal. *See, e.g., Davis*, 512 U.S. at 459 (emphasis in original) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."); *United States v. Hampton*, 675 F.3d 720, 727 (7th Cir. 2012) (emphasis in original) ("[b]ased on this pattern of equivocation and because [defendant's] reference to a lawyer used the hedge word 'but,' we agree with the government that a reasonable officer would have understood only that [defendant] *might* want an attorney present, not that he was clearly invoking his right to deal with the officers only through counsel.")  While I think this is a close call, in looking at the totality of the circumstances, I don't think a reasonable officer would have thought Gist-Holden made a clear and present request for a lawyer, rather, it seems more like he just *might* have been asking for an attorney, which is not enough.

Even if Gist-Holden's statement was definite enough to constitute an unambiguous request for counsel (and I think it probably was not), Gist-Holden does not take Agent Wagner's offer (that he could go to back to his jail cell right then and not talk to anyone), but instead Gist-Holden continues to engage with Agent Wagner by asking if the officers could help him. This re-initiation of the discussion allows the officers to continue to talk to Gist-Holden.  *See Hampton*, 675 F.3d at 728 (following "a

long moment of silence" after the officers told the defendant they could not talk to him if he was asking for a lawyer, the defendant reengaed the officers by asking them a question and "[o]nce he did this, the officers were permitted to resume questioning."); *Hampton v. Schwochert*, 557 F. App'x 554, 556-57 (7th Cir. 2014) (finding suspect re-initiated the discussion after requesting an attorney, when he said "I really do want to talk to you guys right now.").

        **2.**      **"Me getting any type of counsel this late, it'd be too late right?"**

The next statement I need to examine happened after the Indiana agents arrived, at about 6 p.m. Agent Wagner said he was going to read Gist-Holden his *Miranda* rights, and he was welcome to answer as many questions as he wanted or as few as he wanted. [-32 at 54:35.] Agent Wagner then read the *Miranda* form. [-32 at 55:00.] Before he signed the document, Gist-Holden asked, "me getting any type of counsel this late, it'd be too late right?" to which Agent Wagner responded, "you can not answer any questions and then . . . you can get counsel at another point. At this point I don't think there'd be an opportunity to get counsel in here tonight . . . If you decided not to [answer questions] then at some point, you would get counsel and you could answer questions that way." [-32 at 56:00.] Agent Chonowski then clarified that he wanted to be that sure Gist-Holden understood that this document meant he was agreeing to talk to them without counsel. [-32 at 56:58.] Gist-Holden then signed the *Miranda* waiver.

As with the earlier statement, asking about whether it was too late to get counsel is not a present, unambiguous request for counsel. Rather, it is a question about the

process of getting a lawyer.  *See, e.g., Subdiaz-Osorio*, 947 F.3d at 442 (finding no clear invocation of counsel where "[a]n ordinary, reasonable person would understand [defendant] to be asking how to get an attorney at that place and time.").  Moreover, there was nothing deceptive about the agents stating they didn't think they could get an attorney there that night (it was a Friday night, June 18, 2021, when some federal agencies were observing Juneteenth, and it was approximately 6:00 p.m.).  After the agent made sure Gist-Holden understood that if he signed the document, he was agreeing to talk to them without counsel, Gist-Holden signed the document, and when Agent Gootee asked if he had any questions for them, Gist-Holden proceeded to talk and continue with the interview. [-32 at 57:50.]

### 3.    "I want a lawyer to assist."

The next statement that Gist-Holden made, referring to an attorney, is one he made in the hallway, caught only on the audio recording.  Gist-Holden had already brought up the topic that he might be able to give some information to the government if they could help him, and at one point in the hall, it is difficult to hear, but it sounds like Gist-Holden says, "I want a lawyer to assist." [Hall, 5:14.] The agent asked "with what?" and Gist-Holden indicates he wants a lawyer for the government to help *him* (presumably, he is referring to some kind of a deal). [Hall, 5:20.]  The agent reminded Gist-Holden that they read him his rights before. [Hall, 5:30.]

Again, given the totality of the circumstances and the fact that Gist-Holden had already signed the *Miranda* waiver and was talking about trying to work out some kind

of deal with the government, this statement does not seem like an unequivocal request for a lawyer to be present during the interrogation.  *See, e.g., United States v. Carrillo*, 660 F.3d 914, 923-24 (5th Cir. 2011) (no clear invocation of right to counsel when defendant said, "I wish I had a lawyer right here" and "I wanted to see if we could push this to where I could get my lawyer" and "I wanted to see if you could work with me and push this deal to where I can get a lawyer and just sit down and talk about it"). The agent did try to clarify the request, and when asked why he wanted an attorney, Gist-Holden stated he wanted an attorney to assist with the government helping him.

### 4. "What would an attorney say?"

Later during the interviews, Gist-Holden stated, "what would an attorney say?" and the agents responded they didn't know, but handed Gist-Holden his *Miranda* rights that he signed the day before. [-58 at 4:00.] This is definitely not an unambiguous request for counsel.

### 5. "I need to be getting a lawyer."  And "would an attorney be able to get me the deal?"

Around noon on June 19th, Agent Gootee asked Gist-Holden if he wanted to start working towards a deal, or an adversarial process. [-39 at 21:07.] Gist-Holden responded, "I don't want to do the adversarial process, I like, I need to be getting a lawyer.  Somebody that will know for sure like, that, you know, that, that, XYZ." [-39 at 21:20.] Agent Gootee said, "you haven't asked for one," and Agent Chonowski referred Gist-Holden to his written *Miranda* waiver and said, "that still applies," and those are

your rights. [-39 at 21:30.] Gist-Holden then asked whether they would be here "when I have a lawyer." [-39 at 21:58.] A few minutes later, Gist-Holden asked, "would an attorney be able to get me the deal?" and Gootee answered, "I can't give you any legal advice" and "we could get you an attorney." [-39 at 23:35.]

   None of these statements are a clear invocation of counsel. The first statement about how he "need[s] to be getting a lawyer" was not a present request to have counsel. Instead, it seems to be discussing the future retention of an attorney. *Shabaz*, 579 F.3d at 819. That doesn't show that Gist-Holden wanted to consult with an attorney "presently." *Hunter*, 708 F.3d at 944-45. This seems to be confirmed by Gist-Holden himself, when he then said that he was wondering if the Indiana agents would still be around "when I have a lawyer." These statements about how a future attorney could affect his negotiations are not a clear and unambiguous request for present counsel.

   In sum, even though I have broken down each statement and looked at it separately, I am convinced that overall, based upon the totality of the circumstances, Gist-Holden knowingly and intelligently waived his *Miranda* rights and voluntarily chose to make statements to the officers. He never made a clear and unambiguous statement that he wanted an attorney, right then, to be present for the interrogations. *See Davis*, 512 U.S. at 459-60 ("[W]hen the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer," there is no Fifth Amendment violation.). In fact, to the contrary, Gist-Holden made several ambiguous and vague repeated references about an attorney, but then immediately continued

talking to the agents.  This was after several attempts that the agents made to clear up

his statements, and make sure that he still wanted to talk to them.  Under these

circumstances, I don't think a reasonable agent would have known that he was

invoking his right to an attorney.

### 6.    "Do you want a lawyer right now, yes or no?  Yes."

The first time Gist-Holden clearly and unambiguously asked for present counsel

was not until around 12:30 p.m. on June 19th, when Gist-Holden brought up the

possibility of getting counsel, and Agent Gootee asked him, "are you saying you want a

lawyer, yes or no?" and then, "do you want a lawyer right now, yes or no?" and Gist-

Holden answered "yes."  [-18 at 11:20, 12:17.] This is a clear invocation.  And the

Indiana agents then properly ceased questioning at that time and left.

### C.    Other Miscellaneous Suppression Issues

Gist-Holden "challeng[es] the validity of two documents that were alleged to be

signed by myself." [DE 41 at 4.]  Although he does not identify these documents, he

presumably is referring to the waiver of his initial appearance and the *Miranda* waiver.

The video shows Gist-Holden signing these documents.  To the extent Gist-Holden is

trying to keep these documents from being admitted into evidence, and is arguing that

they have been tampered with (he contends one document clearly contains a forged

signature and the other document has a signature that was photo shopped) [DE 41 at 4],

this would be an argument for trial regarding the admissibility of the documents.  *See,*

*e.g., United States v. Bridges*, 499 F.2d 179, 185 (7th Cir. 1974) (court can exclude evidence

if it finds a "reasonable probability the article has . . . been changed in important respects.").

Gist-Holden also seeks to suppress the photograph that King took of himself, Briana White (Gist-Holden's girlfriend), and other people inside the Buchanan house. [DE 41 at 4-5.]  He contends that "White did not consent to pictures being taken of her in her private residence, thus violating her privacy rights." [DE 41 at 4.]  This argument, which seems to implicate the Fourth Amendment, fails for numerous reasons.

First, the picture was taken by King, not a governmental person or someone working for the government at that time.  The Fourth Amendment is only implicated by governmental action.  *See, e.g., United States v. Crowley*, 285 F.3d 553, 558 (7th Cir. 2002) (superseded on other grounds).

In addition, if King was an invitee who took a picture of something that he simply witnessed, one can't say that the photograph was evidence of/or constituted a search.  *United States v. Thompson*, 811 F.3d 944, 950 (7th Cir. 2016).  While Gist-Holden argues that King was not an invitee because "King asked to come to the home to help clean.  Once King was told to leave, he was no longer lawfully entitled to the property," [DE 108 at 11] he provides no corroboration for this speculation.  Even if Gist-Holden could somehow show that King was a governmental actor, he can't show that he had a reasonable expectation of privacy inside the Buchanan house if he invited King inside. *Id.* at 948-49 (no invasion of privacy when defendant "invited the informant into the apartment" and he then "discovers information from where he is lawfully entitled to

be.").

It also seems that Gist-Holden is arguing about White's privacy rights, and not his own. He does not have a reasonable expectation of privacy (or standing) to challenge the rights of others. *United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016). For all of these reasons, it wouldn't be appropriate to "suppress" the photograph taken in the Buchanan residence.

Gist-Holden also reiterates his argument in his reply memorandum that the video tapes have been tampered with, and the government has edited out his requests for counsel, and re-recorded certain statements. [DE 106 at 6.] He asks me to look at the first recording, 6/18/21 at 17:21:23 (military time on the top of the frame), and says there is a blur effect on the video, the content of the papers are whited out, and this supports his argument of tampering. [*Id.* at 7.] I have *stared* at this portion of the video, and I do not see anything unusual. Yes, the writing on the paper isn't really visible from the angle of the camera, but there doesn't seem to be anything untoward going on, and overall, the speech seems fluid and continuous, there are no noticeable cuts/edits of any footage, and despite what Gist-Holden claims, it all seems fluid when Agent Wagner places his phones on top of the papers (and his phone is readily visible), and then moves them later. At this point, there is no evidence of tampering with the recordings before me.

Finally, in his amendment to the motion so suppress [DE 69], Gist-Holden argues he was detained unlawfully and arrested unlawfully because Agent Gootee committed

perjury when obtaining the arrest warrant, and "the fruits of the unlawful arrest must be quashed." [DE 69 at 1.] I have already denied a *Franks* hearing because Gist-Holden has not showed that the warrant application was infirm; therefore, this argument also fails.

## Conclusion

For all of the reasons detailed above, the three motions for a *Franks* hearing [DE 42, 43, 47]; motion to dismiss and amended motions to dismiss [DE 51, 68, 84]; motion to dismiss for lack of jurisdiction [DE 67]; and motion to suppress evidence and amendment to the motion to suppress [DE 41, 69], ARE ALL DENIED.

SO ORDERED.

ENTERED: February 22, 2022.

       /s/ Philip P. Simon_____
       PHILIP P. SIMON, JUDGE
       UNITED STATES DISTRICT COURT